## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

————————————————————————

|  |  |
|---|---|
| ANTHONY CAPONE, Individually and On Behalf of All Others Similarly Situated, ) | **CIVIL ACTION NO.** |
| Plaintiff, ) | |
| vs. ) | CLASS ACTION COMPLAINT |
| MBIA INC., JOSEPH W. BROWN, GARY C. DUNTON, NICHOLAS FERRERI, NEIL G. BUDNICK, and DOUGLAS C. HAMILTON, ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |

————————————————————————

Plaintiff, Anthony Capone ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MBIA Inc. ("MBIA" or the "Company") securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of purchasers of the common stock of MBIA between August 5, 2003 and March 30, 2005 (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, the Company maintains its principal executive offices in this Judicial District.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, Anthony Capone, as set forth in the accompanying certification, incorporated by reference herein, purchased MBIA common stock at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant MBIA is a Connecticut corporation with its principal place of business located at 113 King Street, Armonk, NY 10504.

8.     Defendant Joseph W. Brown ("Brown") is chairman of MBIA Inc. Until May 2004, Mr. Brown was chairman and chief executive officer of MBIA Inc., and of its main operating unit, MBIA Insurance Corporation. He joined the company as chairman and CEO in January 1999, having been a board member since 1986.

9.     Defendant Gary C. Dunton ("Dunton") is president and chief executive officer of MBIA Inc. and of its main operating unit, MBIA Insurance Corporation. He is a member of the board of directors and the company's senior Executive Policy Committee.

10.     Defendant Nicholas Ferreri ("Ferreri") is the Company's Chief Financial Officer and assumed this role on May 6, 2004.

11.     Defendant Neil G. Budnick ("Budnick") was, until May 6, 2004, the Company's Chief Financial Officer.

12.     Defendant Douglas C. Hamilton ("Hamilton") was, at all relevant times, the Company's Controller (Principal Accounting Officer).

13.     Defendants Brown, Dunton, Ferreri, Budnick, and Hamilton are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of MBIA's quarterly

reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of MBIA between August 5, 2003 and March 30, 2005, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

15.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, MBIA's common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands

of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by MBIA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

17.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

18.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)  whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of MBIA; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

19.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

20.     MBIA is engaged in providing financial guarantee insurance, investment management

services, and municipal and other services to public finance, and structured finance clients on a

global basis.  The Company conducts its financial guarantee business through its wholly owned

subsidiary, MBIA Insurance Corporation (MBIA Corp.) MBIA Corp. is the parent of MBIA

Insurance Corp. of Illinois (MBIA Illinois) and Capital Markets Assurance Corporation (CapMAC),

both financial guarantee companies. BIA Corp. also owns MBIA Assurance S.A. (MBIA

Assurance), a French insurance company, which writes financial guarantee insurance in the member

countries of the European Union and MBIA UK Insurance Limited (MBIA UK), a financial

guaranty insurance company licensed in the United Kingdom.  The Company also provides

investment management products and financial services.

### Materially False And Misleading
### Statements Issued During The Class Period

21.     The Class Period starts on August 5, 2003.  At that time, MBIA issued a press release

with the headline "MBIA Inc. Reports 54 Percent Increase in First Half Net Income Per Share;

Operating Earnings Per Share up 15 Percent in First Half of 2003."  Therein, the Company stated:

> MBIA Inc. (NYSE: MBI), the holding company for MBIA Insurance
> Corporation, reported today that diluted earnings per share increased
> 54 percent in the first six months to $3.04 from $1.98 in last year's
> first half. Net income for the first half was $441.2 million compared
> with $295.0 million in the same period last year, a 50 percent
> increase.
>
> Second quarter diluted earnings per share increased 57 percent to
> $1.51 from $0.96. Net income for the second quarter rose 53 percent
> to $217.9 million from $142.6 million in last year's second quarter.

***

Net income and the unrealized appreciation on the company's investment portfolio increased MBIA's book value per share at June 30, 2003 to $42.19 from $37.95 at December 31, 2002, up 11 percent. Adjusted book value (ABV) per share, a non-GAAP measure, at June 30, 2003 rose 7 percent to $55.44 from $51.77 at December 31, 2002. ABV includes the after-tax effects of deferred premium revenue less prepaid reinsurance premiums and deferred acquisition costs, the present value of installment premiums, unrealized gains or losses on investment contract liabilities and a provision for loss and loss adjustment expenses.

Neil G. Budnick, MBIA Chief Financial Officer, said, "MBIA recorded strong financial results for the first half of 2003, driven by increased insurance revenues. Earned premiums grew a very healthy 25 percent, reflecting strong top line production at very attractive pricing levels over the past few years. Demand for MBIA's guarantee across all sectors of the global capital markets continues to be strong and our insured portfolio has held up well in a stressful economic environment."

22.    On August 14, 2003, MBIA filed with the SEC its quarterly report on Form 10-Q. The Company's Form 10-Q was signed by defendants Budnick and Hamilton and reaffirmed the Company previously announced financial results referenced in ¶21.  Additionally, the Company, in its Form 10-Q, represented the following:

The accompanying unaudited consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and, accordingly, do not include all of the information and disclosures required by accounting principles generally accepted in the United States of America (GAAP).  These statements should be read in conjunction with the consolidated financial statements and notes thereto included in Form 10-K for the year ended December 31, 2002 for MBIA Inc. and Subsidiaries (the Company).  The accompanying consolidated financial statements have not been audited by independent accountants in accordance with auditing standards generally accepted in the United States of America, but in the opinion of management such financial statements include all adjustments, consisting only of normal recurring adjustments, necessary for a fair

-7-

statement of the Company's financial position and results of operations.

23.     Moreover, defendants Brown and Budnick certified MBIA's financial results pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 by stating the following:

> 1. I have reviewed the Quarterly Report of MBIA Inc. (the "Company") on Form 10-Q for the period ending June 30, 2003 as filed with the Securities and Exchange Commission on the date hereof (the "Report");

> 2. Based on my knowledge, this Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Report;

> 3. Based on my knowledge, the financial statements, and other financial information included in this Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this Report;

> 4. The Company's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:

> (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Report is being prepared;

> (b) evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this Report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this Report based on such evaluation; and

> (c) disclosed in this Report that there were no change in the Company's internal control over financial reporting that occurred

during the Company's second quarter of 2003 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and to the audit committee of the board of directors:

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

24.    On November 4, 2003, MBIA issued a press release with the headline "MBIA Inc. Reports 42 Percent Increase in First Nine Months Net Income Per Share." Therein, the Company stated:

> MBIA Inc. (NYSE: MBI), the holding company for MBIA Insurance Corporation, reported today that diluted earnings per share increased 42 percent in the first nine months to $4.36 from $3.08 in last year's first nine months. Net income for the first nine months was $631.6 million compared with $457.7 million in the same period last year, a 38 percent increase.
>
> Third quarter diluted earnings per share increased 19 percent to $1.31 from $1.10. Net income for the third quarter rose 17 percent to $190.4 million from $162.7 million in last year's third quarter.
>
> ***
>
> MBIA's book value per share at September 30, 2003 increased to $42.24 from $37.95 at December 31, 2002, up 11 percent due to the growth in net income and the unrealized appreciation on the company's investment portfolio. Adjusted book value (ABV) per share, a non-GAAP measure, at September 30, 2003 rose 11 percent to $57.34 from $51.77 at December 31, 2002. ABV includes the after-tax effects of deferred premium revenue less prepaid

reinsurance premiums and deferred acquisition costs, the present value of installment premiums, unrealized gains or losses on investment contract liabilities and a provision for loss and loss adjustment expenses.

Gary Dunton, MBIA president, said, "MBIA posted record top line production driven by very strong results from our domestic and international public finance operations. We are pleased that we were able to achieve this growth while maintaining our stringent underwriting and pricing standards. Strong demand for our guarantee continues unabated in the global capital markets."

25.     On November 13, 2003, MBIA filed with the SEC its quarterly report on Form 10-Q. The Company's Form 10-Q was signed by defendants Budnick and Hamilton and reaffirmed the Company previously announced financial results referenced in ¶24.  Additionally, the Company, in its Form 10-Q, represented the following:

The accompanying unaudited consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and, accordingly, do not include all of the information and disclosures required by accounting principles generally accepted in the United States of America (GAAP). These statements should be read in conjunction with the consolidated financial statements and notes thereto included in Form 10-K for the year ended December 31, 2002 for MBIA Inc. and Subsidiaries (MBIA or the Company). The accompanying consolidated financial statements have not been audited by independent accountants in accordance with auditing standards generally accepted in the United States of America, but in the opinion of management such financial statements include all adjustments, consisting only of normal recurring adjustments, necessary for a fair statement of the Company's financial position and results of operations.

26.     Moreover, defendants Brown and Budnick certified MBIA's financial results pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 by stating the following:

1. I have reviewed the Quarterly Report of MBIA Inc. (the "Company") on Form 10-Q for the period ending September 30, 2003 as filed with the Securities and Exchange Commission on the date hereof (the "Report");

-10-

2. Based on my knowledge, this Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Report;

3. Based on my knowledge, the financial statements, and other financial information included in this Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this Report;

4. The Company's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:

 (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Report is being prepared;

(b) evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this Report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this Report based on such evaluation; and

(c) disclosed  in this Report  that there were no change in the Company's internal control over financial reporting that occurred during the Company's third quarter of 2003 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and to the audit committee of the board of directors:

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are

reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

27.    On February 3, 2004, MBIA issued a press release with the headline "MBIA Inc. Reports 43 Percent Increase in 2003 Earnings Per Share." Therein, the Company stated:

MBIA Inc. (NYSE: MBI), the holding company for MBIA Insurance Corporation, reported today that 2003 diluted earnings per share rose 43 percent to $5.61 per share compared with $3.92 in 2002. Net income for 2003 was $813.6 million compared with $579.1 million for 2002, a 40 percent increase. The increase in net income and earnings per share for 2003 was due to a combination of solid growth in insurance operating income, positive mark-to-market adjustments on the company's insured synthetic credit derivatives and net realized gains generated from shortening the duration of the company's investment portfolio.

Fourth quarter diluted earnings per share increased 49 percent to $1.25 from $0.84 in 2002. Net income for the fourth quarter rose 50 percent to $182.0 million from $121.4 million in last year's fourth quarter.

***

"MBIA had its best year ever in 2003. Significant demand across our product lines resulted in record top line production and bottom line results as well as extraordinary high credit quality of business written. Our team did an excellent job of capitalizing on significant global market opportunities as over 40 percent of business production came from international operations. With an improving global economy and continuing strong demand for the financial guarantee product, MBIA's outlook remains favorable," said MBIA President Gary Dunton.

28.    On March 12, 2004, MBIA filed with the SEC its annual report on Form 10-K. The Company's Form 10-K was signed by defendants Brown, Hamilton, and Dunton and reaffirmed the

Company's financial results announced in ¶27.   Therein, the Company's auditors, PricewaterhouseCoopers LLP, issued the following clean audit report:

> In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income, changes in shareholders' equity and cash flows present fairly, in all material respects, the financial position of MBIA Inc. and its subsidiaries at December 31, 2003 and 2002 and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2003 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

29.   Moreover, defendants Brown and Budnick certified MBIA's financial results pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 by stating the following:

> 1. I have reviewed the Annual Report of MBIA Inc. (the "Company") on Form 10-K for the period ending December 31, 2003 as filed with the Securities and Exchange Commission on the date hereof (the "Report");
>
> 2. Based on my knowledge, this Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this Report, fairly present in all material respects the financial condition, results of operations and

cash flows of the Company as of, and for, the periods presented in this Report;

4. The Company's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Report is being prepared;

(b) evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this Report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this Report based on such evaluation; and

(c) disclosed in this Report that there were no change in the Company's internal control over financial reporting that occurred during the Company's fourth quarter of 2003 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5 The Company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and to the audit committee of the board of directors:

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

30.    On May 4, 2004, MBIA issued a press release with the headline "MBIA Inc. Reports

8 Percent Decrease in First Quarter Earnings Per Share."  Therein, the Company stated:

MBIA Inc. (NYSE: MBI), the holding company for MBIA Insurance Corporation, reported today that net income for the first quarter was $207.6 million compared with $223.3 million in the same period last year, a 7 percent decrease. First quarter diluted earnings per share decreased 8 percent to $1.42 from $1.54 in 2003. The decrease was primarily a result of a pre-tax mark-to-market unrealized loss of $10.7 million, or $0.05 per share, for the first quarter of 2004 compared with a pre-tax mark-to-market unrealized gain of $60.2 million, or $0.27 per share, in the first quarter of 2003.

***

Gary Dunton, MBIA president, said, "While MBIA's operating income for the first quarter was solid, significantly lower new business production was a disappointment. The quarter was characterized by tighter spreads, which decreased insured penetration across all markets and increased competition. While business activity has accelerated recently, the weak first quarter will make it difficult to match 2003's record new business production. Over the longer term, we remain confident that the global capital markets will continue to expand, providing attractive opportunities for new business growth."

31.    On May 7, 2004, MBIA filed with the SEC its quarterly report on Form 10-Q.  The Company's Form 10-Q was signed by defendants Budnick and Hamilton and reaffirmed the Company previously announced financial results referenced in ¶30.  Additionally, the Company, in its Form 10-Q, represented the following:

The accompanying unaudited consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and, accordingly, do not include all of the information and disclosures required by accounting principles generally accepted in the United States of America. These statements should be read in conjunction with the consolidated financial statements and notes thereto included in Form 10-K for the year ended December 31, 2003 for MBIA Inc. and Subsidiaries (the Company). The accompanying consolidated financial statements have not been audited by independent auditors in accordance with auditing standards generally accepted in the United States of America, but in the opinion of management such financial statements include all adjustments, consisting only of

normal recurring adjustments, necessary for a fair statement of the Company's financial position and results of operations.

32.     Moreover, defendants Dunton and Budnick certified MBIA's financial results pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 by stating the following:

1. I have reviewed the Quarterly Report of MBIA Inc. (the "Company") on Form 10-Q for the period ending March 31, 2004 as filed with the Securities and Exchange Commission on the date hereof (the "Report");

2. Based on my knowledge, this Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Report;

3. Based on my knowledge, the financial statements, and other financial information included in this Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this Report;

4. The Company's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Report is being prepared;

(b) evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this Report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this Report based on such evaluation; and

(c) disclosed in this Report that there were no change in the Company's internal control over financial reporting that occurred during the Company's first quarter of 2004 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and to the audit committee of the board of directors:

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

33. On August 3, 2004, MBIA issued a press release with the headline "MBIA Inc. Reports 5 Percent Decrease in First Half Net Income Per Share." Therein, the Company stated:

MBIA Inc. (NYSE: MBI), the holding company for MBIA Insurance Corporation, reported today that diluted earnings per share decreased 5 percent in the first six months of 2004 to $2.90 from $3.04 in last year's first half. Net income for the first half of 2004 was $424.7 million compared with $441.2 million in the same period last year, a 4 percent decrease.

The decrease was a result of small mark-to-market net unrealized gains on MBIA's derivative exposure recorded for the first half of 2004 compared with much larger net unrealized gains for the comparable period of 2003. Excluding the effects of the net unrealized gains, net income for the first six months of 2004 was $423.9 million compared to $374.0 million for the first half of 2003, a 13 percent increase.

Second quarter diluted earnings per share decreased 2 percent to $1.48 from $1.51 in last year's second quarter. Net income for the second quarter was $217.1 million compared to $217.9 million in last year's second quarter. Excluding the effects of the mark-to-market net

unrealized gains, net income for the second quarter of 2004 was $209.3 million, a 10 percent increase over the second quarter of 2003.

\*\*\*

Operating income per share, which excludes the effects of net realized gains, net unrealized gains on derivative instruments and foreign exchange, and income from discontinued operations, rose 11 percent to $2.61 per share for the first half of 2004 compared with $2.35 per share in the same period last year.

Gary C. Dunton, MBIA Chief Executive Officer, said, "MBIA posted strong results for the second quarter of 2004. While our pipeline of new business opportunities remains steady, difficult market conditions will make it unlikely that the company will match last year's record new business production. However, we remain confident that the market will return to a more balanced view of risk and that demand for our product will grow over the long-term as the global capital markets continue to expand."

34.    On August 6, 2004, MBIA filed with the SEC its quarterly report on Form 10-Q.  The Company's Form 10-Q was signed by defendants Ferreri and Hamilton and reaffirmed the Company previously announced financial results referenced in ¶33.  Additionally, the Company, in its Form 10-Q, represented the following:

The accompanying unaudited consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and, accordingly, do not include all of the information and disclosures required by accounting principles generally accepted in the United States of America. These statements should be read in conjunction with the consolidated financial statements and notes thereto included in Form 10-K for the year ended December 31, 2003 for MBIA Inc. and Subsidiaries (the Company). The accompanying consolidated financial statements have not been audited by independent auditors in accordance with auditing standards generally accepted in the United States of America, but in the opinion of management such financial statements include all adjustments, consisting only of normal recurring adjustments, necessary for a fair statement of the Company's financial position and results of operations.

-18-

35.     Moreover, defendants Dunton and Ferreri certified MBIA's financial results pursuant

to Section 302 of the Sarbanes-Oxley Act of 2002 by stating the following:

> 1. I have reviewed the Quarterly Report of MBIA Inc. (the "Company") on Form 10-Q for the period ending June 30, 2004 as filed with the Securities and Exchange Commission on the date hereof (the "Report");
>
> 2. Based on my knowledge, this Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this Report;
>
> 4. The Company's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:
>
> (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Report is being prepared;
>
> (b) evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this Report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this Report based on such evaluation; and
>
> (c) disclosed in this Report that there were no change in the Company's internal control over financial reporting that occurred during the Company's second quarter of 2004 that has materially

affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and to the audit committee of the board of directors:

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

36.     On November 2, 2004, MBIA issued a press release with the headline "MBIA Inc. Reports 4 Percent Decrease in First Nine Months Net Income Per Share; Operating Earnings Per Share up 10 Percent in First Nine Months."  Therein, the Company stated:

MBIA Inc. (NYSE: MBI), the holding company for MBIA Insurance Corporation, reported today that diluted earnings per share decreased 4 percent in the first nine months of 2004 to $4.19 from $4.36 in last year's first nine months. Net income for the first nine months of 2004 was $610.8 million compared with $631.6 million in the same period last year, a 3 percent decrease.

The decrease was the result of small mark-to-market net unrealized losses on MBIA's derivative exposure recorded for the first nine months of 2004, compared with large net unrealized gains for the comparable period of 2003. Excluding the effects of the net unrealized gains and losses, net income for the first nine months of 2004 was $611.2 million, compared to $563.8 million for the first nine months of 2003, an 8 percent increase.

Third quarter diluted earnings per share decreased 2 percent to $1.29 from $1.31 in last year's third quarter. Net income for the third quarter was $186.0 million compared to $190.4 million in last year's third quarter.

***

Operating income per share, which excludes the effects of net realized gains, net unrealized gains and losses on derivative instruments and foreign exchange, and income from discontinued operations, rose 10 percent to $3.91 per share for the first nine months of 2004 compared with $3.57 per share in the same period last year.

Gary C. Dunton, MBIA Chief Executive Officer, said, "MBIA posted solid operating results for the first nine months of 2004, despite the challenging market environment for new business production. We remain determined to aggressively pursue high-quality, profitable business without compromising our underwriting and pricing discipline. Although top line production can fluctuate considerably from year to year, we are confident that we can profitably grow our business at historical levels over the longer term."

37.     On November 5, 2004, MBIA filed with the SEC its quarterly report on Form 10-Q. The Company's Form 10-Q was signed by defendants Ferreri and Hamilton and reaffirmed the Company previously announced financial results referenced in ¶36.  Additionally, the Company, in its Form 10-Q, represented the following:

The accompanying unaudited consolidated financial statements have been prepared in accordance with the instructions to Form 10-Q and, accordingly, do not include all of the information and disclosures required by accounting principles generally accepted in the United States of America. These statements should be read in conjunction with the consolidated financial statements and notes thereto included in Form 10-K for the year ended December 31, 2003 for MBIA Inc. and Subsidiaries (the Company). The accompanying consolidated financial statements have not been audited by independent auditors in accordance with auditing standards generally accepted in the United States of America, but in the opinion of management such financial statements include all adjustments, consisting only of normal recurring adjustments, necessary for a fair statement of the Company's financial position and results of operations.

38.     Moreover, defendants Dunton and Ferreri certified MBIA's financial results pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 by stating the following:

1. I have reviewed the Quarterly Report of MBIA Inc. (the "Company") on Form 10-Q for the period ending September 30, 2004 as filed with the Securities and Exchange Commission on the date hereof (the "Report");

2. Based on my knowledge, this Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Report;

3. Based on my knowledge, the financial statements, and other financial information included in this Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this Report;

4. The Company's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Report is being prepared;

(b) evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this Report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this Report based on such evaluation; and

(c) disclosed in this Report that there were no change in the Company's internal control over financial reporting that occurred during the Company's third quarter of 2004 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial

reporting, to the Company's auditors and to the audit committee of
the board of directors:

(a) all significant deficiencies and material weaknesses in the design
or operation of internal control over financial reporting which are
reasonably likely to adversely affect the Company's ability to record,
process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or
other employees who have a significant role in the Company's
internal control over financial reporting.

39.   The statements contained in ¶¶ 21- 38 were materially false and misleading when
made because defendants failed to disclose or indicate the following: (1) that MBIA, during the
Class Period, overleveraged itself, deeply under-reserved against possible credit defaults, and overly
exposed to guaranteeing risky structured financings; (2) that MBIA accelerated its recognition of
current income by classifying many of its upfront guarantee fees as advisory fees taken at closing,
rather than accounted for over the life of the bonds insured; (3) that MBIA improperly booked a $70
million payment received from Converium Re (then called Zurich Reinsurance North America) in
1998, which at the time was depicted as a loss-reducing reinsurance recovery for MBIA, but was,
in substance, a loan; (4) that as result of this, MBIA financial statements were materially overstated
by $60 million; (5) that MBIA artificially inflated premium income and portfolio credit quality by
insuring bonds in the secondary market that were attracting prices lower than their stale credit
ratings would dictate; (6) that MBIA's low loss ratios resulted from the Company's practice to defer
recognizing problems rather than providing layers of excess collateral, other underwriting
protection, and its self-proclaimed prowess at restructurings; (7) that MBIA set forth an illegal
scheme of covering the loss, from the failed Allegheny Health, Education and Research Foundation
("Aherf") bond issuance, with a retroactive reinsurance policy, giving it a reinsurance recovery of

$170 million to cover the present value of the future Aherf interest and principal payments, which resulted in MBIA showing a better than 40% jump in pretax income that year -- $565 million over what the income figure would have been without resort to the reinsurance; (8) that MBIA was dumping on Channel Reinsurance Ltd., a Bermuda reinsurer where MBIA owns a 17.4% interest, performing but troubled policies from its existing portfolio, with the proviso that it could make up any quality problems later so that MBIA could buy time by getting potential workout loans off its balance sheet in order make its financial results appear better; and (9) that the Company lacked adequate internal controls and was therefore unable to ascertain the true financial condition of the Company.

### The Truth Begins to Emerge

40.     On November 18, 2004, MBIA issued a press release wherein it announced that "it received identical document subpoenas today from the Securities and Exchange Commission and the New York Attorney General's office requesting information with respect to non-traditional or loss mitigation insurance products developed, offered or sold by MBIA to third parties from January 1, 1998 to the present."  Additionally, the Company stated: "The subpoenas do not identify any specific transaction, and MBIA believes the subpoenas were issued in connection with an industry-wide investigation of non-traditional insurance products. MBIA intends to cooperate fully with the Securities and Exchange Commission and the New York Attorney General's request for documents."

41.     On November 23, 2004, MBIA provide additional information regarding the subpoenas referenced in ¶40.  More specifically, the Company stated:

> On Thursday, November 18, MBIA Inc. (NYSE: MBI) announced
> that it had received identical document subpoenas from the Securities

and Exchange Commission and the New York Attorney General's office requesting information with respect to non-traditional or loss mitigation insurance products developed, offered or sold by MBIA to third parties from January 1, 1998 to the present. The subpoenas did not identify any specific transaction.

In a subsequent call made by the Company to the SEC, a representative of the SEC indicated that the investigation will include the reinsurance arrangements entered into by MBIA in 1998 in connection with the bankruptcy of the Delaware Valley Obligated Group (DVOG), an entity that is part of Pittsburgh-based Allegheny Health, Education and Research Foundation (AHERF).

As previously noted, MBIA intends to cooperate fully with the Securities and Exchange Commission and the New York Attorney General's request for documents.

42.    On December 29, 2004, MBIA filed a form 8-K with the SEC regarding the retirement of John B. Caouette, Vice President of the Company and Vice Chairman of the subsidiary. When he left, he was given, in part, the following: all vested benefits, his 2004 bonus in a lump sum payable in March 2005, an amount equal to his 2004 pension contribution, a lump sum payment of $2,822,167 -- his long term incentive compensation for his work 2001-2003. He also agreed not to reveal any information about MBIA.

43.    On February 1, 2005, MBIA issued a press release with headline "MBIA Inc. Reports 1 Percent Decrease in 2004 Earnings Per Share; Operating Earnings Per Share up 10 Percent in 2004."  Therein, the Company stated:

MBIA Inc. (NYSE: MBI), the holding company for MBIA Insurance Corporation, reported today that 2004 diluted earnings per share declined 1 percent to $5.55 per share compared to $5.61 in 2003. Net income for 2004 was $804.1 million compared to $813.6 million for 2003, a 1 percent decrease.

The decrease was the result of small mark-to-market net unrealized gains on MBIA's derivative exposure recorded for 2004, compared with large net unrealized gains for 2003. Excluding the effects of the

-25-

net unrealized gains, net income for 2004 was $803.1 million, compared with $748.8 million for 2003, a 7 percent increase.

Fourth quarter diluted earnings per share increased 9 percent to $1.36 from $1.25 in 2003. Net income for the fourth quarter rose 6 percent to $193.4 million from $182.0 million in last year's fourth quarter.

\*\*\*

Operating income per share, which excludes the effects of net realized gains, net unrealized gains and losses on derivative instruments and foreign exchange, and income from discontinued operations, rose 10 percent to $5.25 per share in 2004 compared to $4.79 per share in 2003. Operating income, excluding refundings, also rose 10 percent to $4.68 per share in 2004 from $4.27 per share in 2003.

For the fourth quarter of 2004, operating income increased 10 percent to $1.34 per share from $1.22 per share in the fourth quarter of 2003. Excluding refundings, fourth quarter operating income rose 14 percent to $1.22 per share in 2004 from $1.07 per share in the same period of 2003.

Gary Dunton, MBIA Chief Executive Officer, said, "MBIA's financial and operating results for 2004 were solid, despite a very challenging market environment characterized by tight credit spreads and increased levels of competition. New business production in insurance operations, while down from last year's record results, was still among the highest in the company's history. Critical to the long-term success of our franchise, we continued to maintain our strict underwriting standards in this demanding environment."

Mr. Dunton added, "While we believe that current market conditions will likely continue this year, we have a solid pipeline across most of our product lines. For 2005, we expect operating earnings per share, excluding refundings, to increase by 10 to 12 percent, but then return to the 12 to 14 percent growth range in 2006-2007. We anticipate that operating ROE will be at the lower end of the 12 to 14 percent range in 2005 due to our strong capital position and the projected decline in refunding volume. Looking forward to 2006 and 2007, we expect that operating ROE will improve and be within the 12 to 14 percent range. We continue to manage MBIA to provide

-26-

long-term growth in shareholder value, and we remain very optimistic about the prospects for our global franchise."

44.     The statement contained in ¶ 43 was materially false and misleading when made for the reasons stated in ¶ 39.

### The Truth Emerges

45.     On March 8, 2005, MBIA announced that it had decided to restate its financial statements for 1998 and subsequent years.  The restatement was being made to correct the accounting treatment for two reinsurance agreements that MBIA entered into in 1998 with Converium Re (previously known as Zurich Reinsurance North America).  The restatement would not have a material effect on MBIA's financial position, and MBIA did not expect the restatement to have any effect on its ratings or on the Triple-A ratings of MBIA Insurance Corporation. Moreover, the Company stated:

> As a result of this restatement, MBIA's financial results for 1998 will reflect a third quarter incurred loss of $70 million related to $265 million of bonds insured by MBIA that were issued by Allegheny Health, Education and Research Foundation (AHERF). The after-tax loss will be approximately $47 million, resulting in net income for the year of approximately $386 million, or $2.57 per share, down 11% from $433 million or $2.88 per share as originally reported.
>
> MBIA estimates that its earnings will be reduced by approximately $6 million (or four cents per share) in 1999, $4 million (or 3 cents per share) in 2000, $3 million (or two cents per share) in 2001 and will have a de minimis effect in 2002. MBIA estimates that its earnings will increase by approximately $2 million (or one cent per share) in 2003 and $4 million (or three cents per share) in 2004. The Company expects to finalize these estimates and file its 2004 audited financial statements in its 10K by the March 16 deadline. The restatement could result in a delay in this filing.
>
> The two reinsurance agreements with Converium consisted of an excess of loss agreement and a quota share agreement. Under the

excess of loss reinsurance agreement, Converium reimbursed MBIA for $70 million of the $170 million loss experienced by MBIA in the third quarter of 1998 on the $265 million of MBIA-insured bonds issued by AHERF, which was recorded as an offset to the loss. Under the reinsurance agreement, MBIA agreed to cede to Converium on a quota share basis new business written with an aggregate of $101 million in net ceded premiums over a six-year period ending October 1, 2004, which was accounted for in the same manner as other quota share treaties.

Under separate agreements to which MBIA was not a party, Converium reinsured the risk that it assumed from MBIA under the quota share agreement for losses in excess of $13 million to AXA Re Finance S.A. (ARF), a subsidiary of AXA Re S.A. ARF contended that, in connection with its agreement to assume this risk from Converium, there was an oral agreement with MBIA under which MBIA would replace ARF as a reinsurer to Converium by no later than October 2005.

In October 2004, MBIA management recommended that the Audit Committee of the Board of Directors undertake an investigation of the AHERF reinsurance arrangement, including whether such an oral agreement existed between MBIA and ARF. The Audit Committee retained outside counsel and initiated an investigation in October 2004. The outside counsel's investigation has been substantially completed. While the investigation has not conclusively determined whether an oral agreement in fact existed, MBIA has been advised, however, that it appears likely that such an agreement or understanding with ARF was made in 1998.

In light of this additional information, MBIA has decided to correct its accounting for the agreements and restate its 1998 and subsequent financial statements with respect to the Converium excess of loss agreement and the quota share agreement. MBIA now believes that the appropriate accounting treatment for the excess of loss and quota share reinsurance agreements with Converium is to record the $70 million paid by Converium under the excess of loss agreement as a deposit and to record the subsequent premium cessions under the quota share agreement as a repayment of the deposit with imputed interest.

As previously disclosed, in November 2004 MBIA received subpoenas from the Securities and Exchange Commission (SEC) and the New York Attorney's General Office (NYAG) related to

non-traditional reinsurance arrangements, including the AHERF reinsurance transaction. The company is cooperating fully with the SEC and the NYAG in their investigations.

In addition to the agreements with Converium related to AHERF, MBIA had agreements with two other reinsurers, ARF and Munich Re, under which those reinsurers reimbursed MBIA for $100 million of AHERF losses incurred by MBIA. MBIA also separately entered into quota share reinsurance agreements with these reinsurers under which it agreed to cede on a quota share basis new business written with an aggregate of $97 million in adjusted gross premiums to ARF and $98 million in adjusted gross premiums to Munich Re over a six-year period ending October 1, 2004. These reinsurers assumed new risk on a pro rata basis in exchange for these premiums. MBIA continues to believe that its accounting for the excess of loss and quota share agreements with ARF and Munich Re is appropriate.

In the fourth quarter of 2004, MBIA assumed from ARF the previously ceded policies that ARF had assumed directly from MBIA under its quota share agreement with MBIA and also reinsured ARF for substantially all of the business that ARF assumed from Converium under the Converium quota share agreement.

46.     Then on March 9, 2005, MBIA announced that it had received a subpoena from the U.S. Attorney's Office for the Southern District of New York seeking information related to the reinsurance agreements it entered into in connection with the loss it incurred in 1998 on bonds insured by MBIA Insurance Corp. that were issued by Allegheny Health, Education and Research Foundation ("AHERF").  These matters are currently under investigation by the Securities and Exchange Commission and the New York State Attorney General's Office, with which the Company has been cooperating.  The Company intended also to cooperate fully with the U.S. Attorney's Office.

47.     On March 30, 2005, after the market closed, MBIA announced that it received additional requests from the New York Attorney General's Office (NYAG) and the Securities and

Exchange Commission (SEC) that supplement the subpoenas it received in late 2004.  The requests sought documents relating to the Company's accounting treatment of advisory fees; its methodology for determining loss reserves and case reserves; instances of purchase of credit default protection on itself; and documents relating to Channel Reinsurance Ltd., a reinsurance company of which MBIA is part owner.  The requests cover the period January 1, 2000 to the present.  MBIA was cooperating fully with the NYAG and the SEC.

48.     On this news, shares of MBIA fell $4.36 per share, or 7.7 percent, to close at $52.28 per share on unusually heavy trading volume.

### UNDISCLOSED ADVERSE FACTS

49.     The market for MBIA's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, MBIA's common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired MBIA's common stock relying upon the integrity of the market price of MBIA's common stock and market information relating to MBIA, and have been damaged thereby.

50.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of MBIA's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

51.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about MBIA's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of MBIA and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

52.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding MBIA, their control over, and/or receipt and/or modification of MBIA's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning MBIA, participated in the fraudulent scheme alleged herein.

-31-

53.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

54.     During the Class Period, MBIA was able to raise $350 million through the offering a 30-year bond.

**Applicability Of Presumption Of Reliance:
Fraud-On-The-Market Doctrine**

55.     At all relevant times, the market for MBIA's common stock was an efficient market for the following reasons, among others:

(a)  MBIA's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)  As a regulated issuer, MBIA filed periodic public reports with the SEC and the NYSE;

(c)  MBIA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)  MBIA was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

56.     As a result of the foregoing, the market for MBIA's common stock promptly digested current information regarding MBIA from all publicly-available sources and reflected such information in MBIA's stock price. Under these circumstances, all purchasers of MBIA's common stock during the Class Period suffered similar injury through their purchase of MBIA's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

57.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of MBIA who knew that those statements were false when made.

### FIRST CLAIM
### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase MBIA's common stock at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

60.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for MBIA's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

61.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of MBIA as specified herein.

62.     These defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MBIA's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make

-34-

the statements made about MBIA's and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of MBIA's common stock during the Class Period.

63.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which he or she knew or recklessly disregarded was materially false and misleading.

64.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing MBIA's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As

demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

65.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of MBIA's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of MBIA's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired MBIA's common stock during the Class Period at artificially high prices and were damaged thereby.

66.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that MBIA was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their MBIA common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

67.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

68.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**SECOND CLAIM**
**Violation Of Section 20(a) Of**
**The Exchange Act Against the Individual Defendants**

69.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.     The Individual Defendants acted as controlling persons of MBIA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

71.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control

or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

72.    As set forth above, MBIA and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: April 4, 2005

**By:** <u>*/s/Evan J. Smith, Esquire* (ES-3254)</u>
**BRODSKY & SMITH, LLC**
Evan J. Smith, Esquire
240 Mineola Boulevard
Mineola, NY 11501
(516) 741-4977

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz, Esquire
Richard A. Maniskas, Esquire
280 King of Prussia Rd.
Radnor, PA 19087
(610) 667-7706

-39-