UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x
                                         |    05 Civ. 03514 (LLS)
In re MBIA INC. SECURITIES LITIGATION    |
                                         |    **OPINION AND ORDER**
----------------------------------------x
                                         |
This document relates to:                |
                                         |
    ALL ACTIONS                          |
                                         |
----------------------------------------x

        Plaintiffs bring this consolidated securities fraud class
action alleging that MBIA Inc.'s financial statements were
materially misstated because MBIA improperly treated a series of
transactions in 1998 as reinsurance agreements, and the
associated proceeds as income, although they were in fact
disguised loans.

        Defendants move to dismiss under Fed. R. Civ. P. 9(b) and
12(b)(6).  They argue that plaintiffs' claims are time-barred
because plaintiffs should have discovered the alleged fraud no
later than December 2002 and the first complaint in these
actions was not filed until April 5, 2005.  Defendants also
argue that plaintiffs have not adequately pled that the alleged
misstatements were material, or were made with scienter, or that
the alleged fraud caused plaintiffs' loss.

## I.   Background

Lead plaintiffs, the Southwest Carpenters Pension Trust and the City of Pontiac General Employees' Retirement System, bring this putative class action on behalf of all purchasers of MBIA, Inc.'s securities between August 5, 2003 and March 30, 2005 against MBIA, Inc., six current and former MBIA officers, a former MBIA Chairman and Chief Executive Officer, and MBIA's current Chairman.[1] The first count of the complaint alleges that all defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.   The second count alleges liability under Section 20(a) of the Exchange Act against all individual defendants as "control persons" of MBIA.

Except where otherwise stated, the following facts are alleged in the Consolidated Amended Class Action Complaint ("the complaint") and are accepted as true for purposes of this motion.

---

[1] The individual defendants are Gary Dunton (MBIA's President and, since May 2004, its Chief Executive Officer), Neil G. Budnick (MBIA's Chief Financial Officer and Vice President until May 2004 when he became President of MBIA Insurance Corporation), Joseph W. Brown (MBIA's Chairman), Douglas C. Hamilton (MBIA's Assistant Vice President and Controller), Nicholas Ferreri (MBIA's Chief Financial Officer since May 2004), David H. Elliot (MBIA's Chairman and Chief Executive Officer until May 1999), Julliette S. Tehrani (MBIA's Executive Vice President, Chief Financial Officer and Treasurer until September 1998 when she became special assistant to defendants Elliot and Brown) and Richard L. Weill (MBIA's Vice President and Secretary until April 2004).  Compl. ¶ 19.

### A. MBIA and the 1998 Transactions

MBIA's primary business is selling financial guarantee insurance to public finance and structured finance clients. Through its wholly owned subsidiary, MBIA Insurance Corporation, MBIA guarantees the payment of principal and interest on bonds issued by its clients, in exchange for a premium. MBIA's clients are able to pay lower interest on bonds guaranteed by MBIA because MBIA has a "Triple A" claims paying ability rating[2] from the major credit rating agencies. As long as the saving on interest is more than the premium MBIA charges, its clients have an incentive to purchase MBIA's guarantee.

In 1998, one of MBIA's financial guarantee clients was the Delaware Valley Obligated Group ("DVOG"), a Philadelphia area medical group that was part of the Allegheny Health Education and Research Foundation ("AHERF"), a Pennsylvania medical group. MBIA had insured $256 million of outstanding AHERF bonds.[3]   In July 1998, AHERF announced that DVOG would file for bankruptcy,

---

[2] According to plaintiffs, a "'claims paying ability rating' is an evaluation by a rating agency of the relative ability of an insurance company to honor its insurance or contractual liabilities as distinct from its debt obligations.  Such a rating goes to the core of an insurance company's ability to do business." Pl. Mem. Opp. Mot. Dismiss at 4.

[3] Although the bonds were issued by DVOG, Compl. ¶ 34, the complaint refers to them as "AHERF bonds".  For ease of reference, this opinion will conform to that usage.

obliging MBIA to pay DVOG bondholders $170 million in principal and interest.

That large a loss would have diminished MBIA's loss reserves and jeopardized its Triple A credit rating. To avoid that, MBIA made a series of transactions with three reinsurance companies. In September 1998, Muenchener Reuckversicherungs-Gesellshaft ("Munich Re") and AXA Re Finance S.A. ("AXA Re") each agreed to insure MBIA for up to $50 million in losses, and Converium Reinsurance (North America) Inc. (formerly known as Zurich Reinsurance (North America), Inc.) ("Converium") agreed to insure MBIA for up to $70 million in losses (Munich Re, AXA Re and Converium collectively will be referred to as "the Reinsurers"). In exchange for this $170 million commitment, MBIA paid $3.85 million in premiums to the Reinsurers ($2 million to Munich Re, $1.5 million to AXA Re and $350,000 to Converium). MBIA accounted for those transactions as "retroactive reinsurance agreements" and booked their proceeds as income, thus offsetting MBIA's loss on the AHERF bonds, and avoiding a potential downgrade in MBIA's credit rating.

To induce the Reinsurers to cover the $170 million, MBIA made a series of side agreements with them, which plaintiffs allege were not publicly disclosed. MBIA promised to transfer insurance policies on the highest rated bonds in its portfolio,

along with the associated premiums, to the Reinsurers over a period of six years.

On March 8, 2005, MBIA announced that there was probably also an undisclosed promise by MBIA to relieve AXA Re of a portion of the risk MBIA had ceded to Converium, who ceded it to AXA Re.  Compl. ¶¶ 41, 42, 118.

### B. MBIA's Disclosures and News Reports Regarding the 1998 Transactions

On September 29, 1998, MBIA issued a press release describing those transactions.  MBIA announced that it:

> has obtained $170 million of reinsurance that it expects will cover anticipated losses arising from the bankruptcy of the Delaware Valley Obligated Group (DVOG).  As a result, the company does not expect exposure to this insured credit to affect its earnings or reduce its unallocated loss reserve.
>
> . . . .
>
> "As part of our risk management efforts, the company has entered into strategic business relationships with highly rated reinsurers to provide them with future business as part of the reinsurance agreement.  The cost of these reinsurance arrangements over the next few years will have a minimal impact on earnings while strengthening our claims-paying resources and risk management capabilities," said Richard L. Weill, MBIA vice chairman.

Potenza Decl., Ex. 2.  MBIA's 1998 10-K (filed March 30, 1999) similarly reported:

> As part of the company's portfolio shaping activity in 1998, the company has

> entered into facultative share reinsurance
> agreements with highly rated reinsurers that
> obligate the company to cede future premiums
> to the reinsurers through January 1, 2005. .
> . .
>
> . . . In 1998, $170.0 million was
> received in reinsurance recoveries related
> to the bankruptcy of a Pennsylvania hospital
> group.

Compl. ¶ 48. Substantially identical language was included in MBIA's 1999 10-K (filed March 29, 2000) and 2000 10-K (filed March 30, 2001). Compl. ¶¶ 50, 52. Those filings also contained the delphic language: "Certain reinsurance contracts in 1998 were accounted for on a retroactive basis in accordance with SFAS [Statement of Financial Accounting Standards] 113 'Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts'."

In the following months, market analysts, ratings agencies and news outlets discussed the fact that MBIA had promised to give substantial premiums on low-risk policies to a group of reinsurance companies in exchange for a $170 million up-front payment:

- *The Bond Buyer* quoted a senior director with the Fitch IBCA, Inc. rating agency calling MBIA's reinsurance deals "'the bond insurance equivalent to Houdini'" and stated that "although MBIA would rather have kept the business it will be giving reinsurers, it was a creative solution to limiting the firm's AHERF losses." David Hoffman and Daniel Kruger, *MBIA's Reinsurance of AHERF Debt Will Limit Its Losses*, The Bond Buyer, October 1, 1998, Potenza Decl., Ex. 26.

- A Merrill Lynch analyst report stated that "Under the reinsurance agreement, in order for MBIA to avoid the financial statement effect of the estimated $170 million DVOG-related loss, MBIA has committed to cede future business. . . . The innovative facility has attracted some nay-sayers; 'Houdini' and 'shenanigans' have been used to describe the effect of the reinsurance program. We believe that detractors' main concerns may relate to a lack of information on how the facility actually works and the true 'costs' involved. Moody's has pointed out that the reinsurance arrangement likely will include future cessions of some low-risk business that MBIA otherwise would choose to retain." Merrill Lynch & Co., Comment, *MBIA, Inc.*, October 26, 1998, Potenza Decl., Ex. 13 at 3.

- *PR Newswire* reported that "MBIA insured $256 million of DVOG, and these bonds will experience about a $170 million shortfall. However, through an innovative reinsurance arrangement, MBIA ceded the first $170 million of losses to a group of reinsurers in exchange for providing substantial business to those reinsurers in the future." *Bond Insurers Join Global Economy, Says Fitch IBCA*, PR Newswire, October 28, 1998, Potenza Decl., Ex. 27.

- Moody's Investors Service stated that "In July 1998, [AHERF] filed for bankruptcy protection for its eight Philadelphia-based hospitals, including hospitals in the [DVOG].   To minimize the impact of the loss on current period earnings, MBIA entered into a special reinsurance agreement with three European multi-line reinsurers.  This agreement calls for MBIA to cede a portion of its insured par to these companies in the next six years in exchange for an upfront payment of $170 million to cover losses from AHERF." *MBIA Insurance Corporation*, Moody's Investors Service, Global Credit Research, August 1999, Potenza Decl., Ex. 28 at 4.

- Standard & Poor's stated that "In a related transaction that confused some and calmed others, the losses were removed from the MBIA income statement through the use of reinsurance.   A group of 'AAA' rated reinsurers agreed to pay the AHERF claims bill in return for future business, which would reimburse that payment, as well as provide a reasonable profit margin." Robert E. Green and Richard P. Smith, *MBIA Insurance Corp.*, Standard & Poor's Bond Insurance Book, 1999, Potenza Decl., Ex. 29 at 96-97.

On December 9, 2002 a "then well known hedge fund investor", Gotham Partners Management Co., issued a research report entitled "Is MBIA Triple-A?, A Detailed Analysis of SPVs, CDOs, and Accounting and Reserving Policies at MBIA, Inc." The report is cited in the complaint, ¶ 55., and is attached to defendants' counsel's declaration, Potenza Decl., Ex. 14.  A section of the report titled "Credit Concerns in MBIA's Guarantee Portfolio" stated:

> MBIA has in recent years begun to show problems in its guarantee portfolio.  As mentioned previously, in 1999, one of the company's larger hospital credits (Allegheny Health Education and Research Foundation) filed for bankruptcy leaving it with losses totaling approximately $320 million.  MBIA was able to eliminate the earnings impact of this loss by obtaining $170 million of "reinsurance" which it used to offset the after-tax loss at a minimal undisclosed cost, in exchange for an agreement to cede future business to these reinsurers.  We quote below from the company's contemporaneous [September 29, 1998] press release:
>
> . . . .
>
> Mr. Budnick [then MBIA's Vice President and CFO] described this transaction to us as the company "borrowing" money from the reinsurers and "paying it back" through a commitment to cede future businesses. As a result of the reinsurance, the company was able to avoid booking a loss on the AHERF transaction while simultaneously maintaining its unallocated loss reserve.  Standard and Poor's has recently described MBIA's retroactive financial reinsurance of AHERF as "innovative." [footnote omitted]  We do

> not know of other instances in which the
> company may have used financial reinsurance
> to mitigate other losses in its portfolio,
> but believe that this mechanism is not in
> fact reinsurance, but rather a loss-
> deferral, earnings-smoothing device.

Potenza Decl., Ex. 14 at 47-48.

That same day, MBIA issued a press release asserting that:

> the 66-page "research report" issued earlier
> today by Gotham Partners is not independent
> objective research but rather a negative
> advocacy piece by a hedge fund that has
> shorted MBIA stock and has also taken a
> speculative position in derivatives on MBIA-
> insured debt.
>
> Gotham's objective is to profit from
> its positions if its "research report"
> results in a decline in MBIA's stock price
> or a widening of spreads on these types of
> derivatives.
>
> MBIA Chairman Jay Brown said, "Many of
> the points raised in the Gotham report are
> patently wrong, and demonstrate a clear lack
> of understanding. We stand firmly by the
> soundness of our book of business and the
> quality of our underwriting. We also
> believe in the transparency of the capital
> markets and support the right of investors
> to take long or short positions and to voice
> their opinions in appropriate public forums.
> However, especially at the time when the
> integrity of Wall Street research is
> undergoing unprecedented scrutiny, investors
> should carefully consider the credibility of
> any negative report issued by a hedge fund
> that would directly benefit from a decline
> in MBIA's share price. MBIA will respond to
> any points that it determines merit a
> further response and will take all actions
> necessary to protect our shareholders,
> policyholders and constituents."

Compl. ¶ 56.   The press release contained no factual discussion of the transactions related by the Gotham Partners report.

### C. Allegedly False and Misleading Statements

The gravamen of the complaint is that MBIA improperly accounted for the proceeds of the 1998 transactions as income from reinsurance rather than as a loan, which allowed MBIA to defer recognition of the $170 million loss on the AHERF bonds, and caused MBIA's reported income from 1998 to 2003 to be materially overstated in violation of Generally Accepted Accounting Principles.   Compl. ¶¶ 59, 67, 76.   According to the complaint, the 1998 transactions should have been considered a loan because MBIA's promise to repay the Reinsurers over six years with low-risk business eliminated any transfer of risk to the Reinsurers.   Compl. ¶¶ 106-117; see id. ¶ 131 ("By entering into 'side agreements' with three reinsurers whereby the reinsurers paid MBIA for its loss on the AHERF transaction in exchange for sharing in premiums on future 'low risk' or virtually 'no risk' deals, Defendants improperly accounted for the proceeds it received under the reinsurance contracts as income which materially lessened the impact that the AHERF transaction would have on its loss reserves.").

Plaintiffs also claim that MBIA falsely represented in its 2003 and 2004 10-K filings that its financial reporting and

disclosure controls and procedures were effective.   Compl. ¶¶
96-97, 128-129.

## II.  Legal Standards

### A. Motion to Dismiss

A complaint should not be dismissed pursuant to Fed. R.
Civ. P. 12(b)(6) for failure to state a claim upon which relief
can be granted "unless it appears beyond doubt that the
plaintiff can prove no set of facts in support of his claim
which would entitle him to relief." Conley v. Gibson, 355 U.S.
41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).  In ruling on a
Rule 12(b)(6) motion, a court's task "is merely to assess the
legal feasibility of the complaint, not to assay the weight of
the evidence which might be offered in support thereof." Ryder
Entergy Distribution Corp. v. Merrill Lynch Commodities, Inc.,
748 F.2d 774, 779 (2d Cir. 1984).  "Generally, a court should
not look beyond the pleadings on a motion to dismiss the
complaint.  However, publicly-filed documents may be considered,
and customarily are in securities fraud cases." De La Fuente v.
DCI Telecoms., Inc., 206 F.R.D. 369, 375 (S.D.N.Y. 2002), citing
Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991).

### B. Statute of Limitations

The Supreme Court held in 1991 that litigation under
Section 10(b) and Rule 10b-5 must be commenced "within one year
after the discovery of the facts constituting the violation and

within three years after such violation." Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364, 111 S. Ct. 2773, 115 L. Ed. 2d 321 (1991). The Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 804(a), extended the limitations periods for private securities fraud cases that were not already barred prior to Sarbanes-Oxley's enactment on June 30, 2002, to two years from discovery and five years from the violation. See In re Enter. Mortgage Acceptance Co., Sec. Litig., 391 F.3d 401, 403 (2d Cir. 2004).[4] However, "passage of the Sarbanes-Oxley Act did not change the well settled law in this Circuit as to what constitutes 'discovery of facts' sufficient to trigger the statute of limitations in a securities fraud action." Sedona Corp. v. Ladenburg Thalmann & Co., Inc., No. 03 Civ. 3120 (LTS), 2005 WL 1902780, at *7 (S.D.N.Y. Aug. 9, 2005).

---

[4] Section 804 of Sarbanes-Oxley amended 28 U.S.C. § 1658(b) to provide:

> Notwithstanding subsection (a), a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of--
>
> (1) 2 years after the discovery of the facts constituting the violation; or
>
> (2) 5 years after such violation.

28 U.S.C. § 1658(b) (West 2006).

"Discovery takes place when the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir. 1992). Thus, "'discovery' under the 1934 Act limitation provisions includes constructive or inquiry notice, as well as actual notice." Menowitz v. Brown, 991 F.2d 36, 41 (2d Cir. 1993), citing Kahn, 970 F.2d at 1042. "The test as to when fraud should with reasonable diligence have been discovered is an objective one." Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir. 1983). Therefore, "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 (2d Cir. 1993), citing Armstrong, 699 F.2d at 88.

The circumstances that give rise to a duty of inquiry are often referred to as "storm warnings". Dodds, 12 F.3d at 350. To constitute storm warnings, the information "'must be such that it relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants.'" Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003), quoting Morin v. Trupin, 809 F. Supp. 1081, 1097

(S.D.N.Y. 1993); <u>see</u> <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 168 (2nd Cir. 2005); <u>Dietrich v. Bauer</u>, 76 F. Supp. 2d 312, 344 (S.D.N.Y. 1999).  Although the fraud must be probable, not merely possible, <u>Newman</u>, 335 F.3d at 193, an investor "does not have to have notice of the entire fraud being perpetrated to be on inquiry notice."  <u>Dodds</u>, 12 F.3d at 352 (the issue is whether an investor has "constructive notice of facts sufficient to create a duty to inquire further into that matter"); <u>see</u> <u>Salinger v. Projectavision, Inc.</u>, 972 F. Supp. 222, 229 (S.D.N.Y. 1997) ("The plaintiffs need not be able to learn the precise details of the fraud, but they must be capable of perceiving the general fraudulent scheme based on the information available to them.").

    Inquiry notice can arise based on facts disclosed in "any financial, legal or other data available to the plaintiffs[.]" <u>In re Integrated Res. Real Estate Ltd. P'ship. Sec. Litig.</u>, 815 F. Supp. 620, 639 (S.D.N.Y. 1993); <u>see</u> <u>Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.</u>, No. 05 Civ. 1898 (SAS), 2005 U.S. Dist LEXIS 19506, at *38 (S.D.N.Y. Sept. 6, 2005) ("It is well established that a plaintiff is charged with knowledge of publicly available rating agency and analyst reports.").  Articles in the financial press may of course give inquiry notice.  <u>See</u> <u>Shah v. Meeker</u>, 435 F.3d 244, 249 (2d Cir. 2006).  Indeed, a single published article may be sufficient to

impose the duty to inquire.  See, e.g., In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 200 n.7 (S.D.N.Y. 2003), citing In re Ultrafem Inc. Sec Litig., 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000) and Sterlin v. Biomune Sys., 154 F.3d 1191, 1202-04 (10th Cir. 1998).

The date the limitations period starts to run depends on how the plaintiff responds to the duty to inquire.  If the investor begins to investigate when the duty arises, knowledge of the fraud will not be imputed, and the limitations period will not begin to run, until that investor "'in the exercise of reasonable diligence, should have discovered'" the fraud.  LC Capital Partners, LP v. Frontier Ins. Group, 318 F.3d 148, 154 (2d Cir. 2003), quoting Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000).  On the other hand, "If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose."  LC Capital Partners, 318 F.3d at 154; see In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d at 202 ("Inquiry notice is tantamount to actual discovery of a fraud when a plaintiff, having received knowledge sufficient to trigger a diligent investigation, fails to inquire into the facts.").

The Court of Appeals has cautioned that "whether a plaintiff had sufficient facts to place it on inquiry notice is 'often inappropriate for resolution on a motion to dismiss.'"

LC Capital Partners, 318 F.3d at 156, quoting Marks v. CDW Computer Ctr., Inc., 122 F.3d 363, 367 (7th Cir. 1997). However, where "the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint, resolution of the issue on a motion to dismiss is appropriate", and courts in this circuit have done so in "'a vast number of cases.'" LC Capital Partners, 318 F.3d at 156, quoting Dodds, 12 F.3d at 352 n.3 (alteration in LC Capital); see De La Fuente, 206 F.R.D. at 381 ("The law in this circuit is clear, however, that a court can, as a matter of law, determine whether an investor of ordinary intelligence would be on inquiry notice in the circumstances described in the complaint.").

The Second Circuit has noted "occasions when, despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management." LC Capital Partners, 318 F.3d at 155. "However, reassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern." Id. That depends "in large part on how significant the company's disclosed problems are, how likely

they are of a recurring nature, and how substantial are the 'reassuring' steps announced to avoid their recurrence." Id.

**III. Discussion**

**A. Statute of Limitations**

Defendants argue that the statute of limitations bars plaintiffs' claims because plaintiffs were on inquiry notice of MBIA's improper accounting treatment of the 1998 transactions more than two years before this action was commenced. Defendants rely upon MBIA's own September 1998 press release, as well as the news articles and analyst reports that discussed the 1998 transactions, leading up to Gotham Partners' December 9, 2002 report, which repeated many of the earlier disclosures and stated that the 1998 transactions should not have been considered reinsurance. Potenza Decl., Ex. 14 at 47-48. Defendant Budnick, MBIA's Vice President and CFO at the time, was quoted as describing the 1998 deals as "'borrowing' money from the reinsurers and 'paying it back' through a commitment to cede future businesses." Id. at 48. The Gotham report concluded that the 1998 transactions were "not in fact reinsurance, but rather a loss-deferral, earnings-smoothing device." Id.; see Compl. ¶ 55.

That criticism directly addresses the misrepresentations and omissions alleged in the complaint, i.e., that the MBIA should have treated the 1998 transactions as loans because it

promised to give the Reinsurers low-risk business in exchange for the $170 million proceeds, and that MBIA used those transactions to defer recognition of a loss on the AHERF bonds and lessen the impact on its earnings. Thus, the Gotham Partners report, in conjunction with the earlier disclosures regarding the 1998 transactions, effectively put the market, including plaintiffs, on notice of the probability of misrepresentation and deception. Cf. Shah, 435 F.3d at 251 (affirming dismissal on limitations grounds where the improper business practices that served as the basis for the complaint were specifically described in a *Fortune* magazine article); In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d at 200 (inquiry notice arose from *Fortune* magazine article that "did not merely indicate general financial difficulties at GC; rather, it laid out in detail precisely the transactions at the heart of plaintiffs' allegations of accounting fraud"); In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d at 693 (inquiry notice given by one *Bloomberg* news article and one public filing that disclosed the allegedly concealed negative information regarding defendants' product).

Plaintiffs assert that investors "were not put on notice of any fraud described in the Gotham Partners report because in an immediate response," MBIA issued a statement "vehemently denying all of the allegations[.]" Compl. ¶ 56. MBIA's December 9,

2002 press release attacked Gotham Partners' objectivity as a short-seller of MBIA securities, and quoted Jay Brown, MBIA's Chairman, as saying: "'Many of the points raised in the Gotham report are patently wrong, and demonstrate a clear lack of understanding.  We stand firmly by the soundness of our book of business and the quality of our underwriting." Compl. ¶ 56.

But MBIA's release did not even specify the 1998 transactions, let alone address the particular concerns raised by Gotham, or identify any steps to relieve those concerns. MBIA's blanket response was no more than the "mere expressions of hope, devoid of any specific steps taken to avoid under-reserving in the future" that led the Court of Appeals to reject the claimed reassurances in LC Capital Partners.  318 F.3d at 156; cf. De La Fuente, 206 F.R.D. at 384-85 (statements that focused on issuer's overall future and did not comment on the propriety of its challenged accounting methodologies did not negate storm warnings).  As a matter of law, plaintiffs could not have reasonably relied on MBIA's December 9, 2001 vague and general press release to allay the concerns raised by the Gotham Partners report and the series of prior disclosures.

The cases plaintiffs cite are distinguishable.  In In re ProNetLink Sec. Litig., 403 F. Supp. 2d 330 (S.D.N.Y. 2005), plaintiffs alleged that company executives perpetrated a "pump and dump scheme" by exaggerating the number of current and

projected customers and selling their stock despite a promise that they would not do so.  Id. at 332-33.  The court held that later disclosures of lower customer projections did not disclose the probability of fraud.  Id. at 334.  The court added that "these disclosures were contravened by several allegedly false and misleading statements that could have caused a reasonable shareholder to think all was well with PNL's business", such as references to promising sources of revenue.  Id.  Here, the storm warnings attacked the very transactions challenged in the complaint, for the same reasons alleged in the complaint.

The reassuring statements in In re eSpeed Inc. Sec. Litig., 457 F. Supp. 2d 266, 284-85 (S.D.N.Y. 2006), unlike MBIA's response to the Gotham Partners report, "went beyond mere expressions of hope but instead were designed to specifically address the concerns raised in" the articles cited by defendants.  Id. at 284.

Lastly, in Milman v. Box Hill Sys. Corp., 72 F. Supp. 2d 220, 229 (S.D.N.Y. 1999) the court held that disclosure of a reduction in price for the issuer's products did not put investors on notice of fraud because the same disclosure announced an increase in demand for those products.  Thus, it was not "so clear a notice of wrongdoing as to constitute a 'storm warning'".  Id.

Plaintiffs contend that an oral side agreement (under which MBIA promised, as part of the 1998 transactions, to re-assume part of the risk it had ceded to one of the Reinsurers) was not disclosed until March 2005. That is of no help to plaintiffs. The undisclosed existence of that aspect of the transaction does not diminish the duty of inquiry which arose from what was disclosed in 2002 and prior years. Even if knowledge of that later-revealed agreement might also have invited investigation, the information publicized by 2002 gave sufficient notice that investigation was required at that time.

Plaintiffs therefore were obliged to inquire further into the proper accounting for the 1998 transactions and their effect on MBIA's earnings no later than December 2002. Since there was no timely investigation, knowledge will be imputed to plaintiffs as of that date. See Shah, 435 F.3d at 251; LC Capital Partners, 318 F.3d at 154; Rothman, 220 F.3d at 97.

### B. Section 20(a) Claims

Plaintiffs' claims for control person liability under Section 20(a)[5] of the Exchange Act are subject to the same

---

[5] Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is

statute of limitations as Section 10(b) claims because section 20(a) "merely creates a derivative liability for the violations of other sections of the [Exchange] Act." Dodds, 12 F.3d at 349 n.2; see De La Fuente, 206 F.R.D. at 376.  Because the direct claims under Section 10(b) and Rule 10b-5 are time barred, the Section 20(a) claims must also be dismissed.

### IV.  Conclusion

Because plaintiffs' claims are barred by the statute of limitations applicable to private securities fraud claims, the court need not consider defendants' other arguments for dismissal.

For the above reasons, the Consolidated Amended Class Action Complaint is dismissed.


So Ordered.

Dated: New York, NY
       February 13, 2007

_____
           Louis L. Stanton
           U.S.D.J.

_____

                liable, unless the controlling person acted
                in good faith and did not directly or
                indirectly induce the act or acts
                constituting the violation or cause of
                action.

15 U.S.C. § 78t(a) (West 1997).